BALDWIN CO. v. R. S. HOWARD CO.

(District Court, S. D. New York.    May 15, 1916.    On Settlement of Final Decree, May 23, 1916.)

Equity 13–75.

1. WITNESSES ☞176(2)—COMPETENCY—TRANSACTIONS WITH DECEDENTS.

Under Code Civ. Proc. N. Y. § 829, making a survivor incompetent to testify as to transactions with decedent, one who contracted with a corporation is not after the death of the agent with whom he contracted competent to testify as to such transactions, but, if his testimony be considered, the agent's report to the corporation is rendered competent.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 716; Dec. Dig. ☞176(2).]

2. TRADE-MARKS AND TRADE-NAMES ☞33—TRANSFER.

There is no such thing as the transfer of a trade-mark in gross, and a salesman who sold under his own name pianos manufactured by the company for which he worked, but who made no pianos himself, has no trade-mark in the name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. ☞33.]

3. TRADE-MARKS AND TRADE-NAMES ☞21—RIGHT TO TRADE-MARK.

A piano salesman named "Howard," before entering the employment of plaintiff, sold pianos manufactured by his first employer under his own name; the word "company" being almost always added. After he entered plaintiff's employment, the first company abandoned the manufacture of pianos under the name "Howard," and plaintiff commenced manufacturing such pianos, ultimately using the name "Howard," without any other addition. Thereafter such salesman organized the defendant corporation to make pianos, and it first manufactured pianos under the name "R. S. Howard Co.," or "R. S. Howard." *Held*, that plaintiff alone was entitled to use the single name "Howard," and the defendant corporation could not appropriate it.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24; Dec. Dig. ☞21.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On Settlement of Final Decree.

4. TRADE-MARKS AND TRADE-NAMES ☞100—RIGHT TO—USE.

    In such case, the defendant company will not be allowed to use the name "Howard" without the addition of the word "Company" so as to distinguish its products from those of plaintiff.

    [Ed. Note.—For other cases, see Trade-Marks and Trade Names, Cent. Dig. § 114; Dec. Dig. ☞100.]

In Equity. Bill by the Baldwin Company against the R. S. Howard Company, which counterclaimed. Decree for complainant.

Final hearing in equity, plaintiff suing for infringement of trade-mark 31,-411 registered May 8, 1898; also, of trade-mark 46,993, registered October 17, 1905; also, of the name "Howard" as a common-law trade-mark for pianos, and for unfair competition in that the defendant uses, or threatens to use, the name "Howard" in marking, and in connection with the sale of pianos, as distinguished from the name "R. S. Howard Company," "R. S. Howard Co.," or 'R. S. Howard."

The registered trade-marks referred to cover the word "Howard" as applied to pianos; the earlier one in connection with certain initials indicative of the selling corporation, and the later one the same word displayed in a peculiar or distinctive matter or type.

The prayer of the bill is for the usual relief, and, in addition, that defendant be enjoined from further prosecuting certain cancellation proceedings now pending in the Patent Office in respect of the said two trade-marks.

The plaintiff company is the successor in interest, title, and business of the concerns (inter alios) which registered said two trade-marks. Those concerns either made or sold (or both) pianos marked conspicuously "Howard" and known as Howard pianos. Since 1896, the plaintiff and its predecessors in title and business have pursued this trade, and the mark "Howard" has always been associated with a continuous trade which now belongs to plaintiff. The foregoing is so abundantly proven (and to a large extent undisputed) that the whole line of corporations or partnerships antecedent in business to the present plaintiff will be hereinafter spoken of as the "Baldwin Co." or the "Baldwin concern."

The defendant company was organized in 1902 for the purpose of manufacturing and selling pianos. In it Mr. Robert S. Howard was and always has been the controlling spirit. The company (so to speak) was made out of a piano factory in the city of New York plus the selling ability and salesman's reputation of Mr. Howard.

The defense is that the R. S. Howard Company is the successor of Mr. Howard, who was the first to adopt and use the name "Howard" as a mark for pianos in the year 1889; that he so continued until 1902, when he transferred his business, including the trade-mark or mark or name "Howard" to the defendant, which has continued to use that name down to the time this suit began.

Defendant therefore counterclaims and prays for affirmative relief, in that it may be adjudged to be the sole owner and entitled to the exclusive use of the name "Howard" as a trade-name or trade-mark applied to pianos, and that the plaintiff be enjoined from using that name or the name "Howard Piano Company" in connection with the manufacture and sale of pianos, and also from registering the name "Howard" as a trade-mark in foreign countries, and be compelled to cancel the existing registrations in the Patent Office.

Lawrence Maxwell, of Cincinnati, Ohio, Edmund Wetmore, of New York City, John E. Cross, of Baltimore, Md., and Oscar W. Jeffery, of New York City, for plaintiff.

Samuel S. Watson, of New York City, for defendant.

HOUGH, District Judge (after stating the facts as above). The cancellation proceedings above referred to were brought long before this suit, and the record herein largely consists of the evidence taken in the Patent Office by both parties. It is exceedingly voluminous, and descends into great detail. About these details there is that uncertainty, if not contradiction in nonessentials, which must always be the case when even intelligent and well-intentioned men testify regarding occurrences of many years ago.

After perusing the entire record, however, I am of opinion that as to all relevant facts (in the sense of visible or audible phenomena) there is almost no difference between the parties hereto. Contradictions exist, but they are rather in the inferences to be drawn from what was said or written, than in respect of the happening of this or that event. I shall therefore make the findings of fact herein comparatively brief.

Mr. Robert S. Howard began his active career as a piano tuner in Ohio about 1877. He plainly developed ability far beyond the usual as a salesman, until in 1889, when he entered the employment of the New England Piano Company of Boston, I have no doubt that Mulcahy (one of the principal employés of the New England concern) testified accurately when he said that, though he had never before met Mr. Howard, he had known of him for years as a piano salesman and traveler, and "we" (the New England people) "all congratulated ourselves on making the connection with him." Nor is it doubted that Mr. Gibbs of Chicago, who has known Howard for a long time, correctly described him as a "very popular and prominent traveler and well liked by the trade."

The New England Company manufactured pianos in a Boston factory, one entrance to which was on Howard street. There are indications that this fact had something to do with the use of the name "Howard" by that concern; but undoubtedly the principal and controlling reason for selling pianos of their make with any variant of the word "Howard" on the "fall-board" was due to the fact that Mr. Robert S. Howard wished to have it done when he became a salesman for the company.[1]

The New England Piano Company's product consisted of two grades of pianos. The superior quality bore and was sold under its own name; the inferior product (consisting of about 40 per cent. of the output) was given any name that any customer wished, and Mr. Howard's selection of his own name was but one instance of a common but harmless trade deception. It assisted Howard in selling pianos. The position of the purchaser is amusingly stated by Scanlon, who, when he was asked as to how a man who bought the piano knew the maker, replied:

"You will have to ask that question of the fellow who sold it to him. I never attempted to explain that."

The first consignment of pianos bearing any variant of the name "Howard" went from the New England factory to the Pacific Coast

---

[1] The New England Piano Company was the trade-name of one Scanlon, but it will be spoken of throughout this opinion by its corporate sounding title.

in 1889, and I have no doubt from the testimony of Howard himself and from that (inter alios) of Fox, of Chicago, and Dierks, of Pittsburgh, that Howard represented that the pianos he was selling were "made for him" by the New England Piano Company. This statement was not true. Mr. Howard did give to Scanlon and others his views as to how a piano should be regulated, both as to tone and action, and he probably also expressed opinions as to what constituted an attractive case; but it amounted to no more than what Scanlon testified to, viz., that it was always his custom with anybody that he employed to represent the concern outside, to have them go to the factory, see how the product was created, and "we were always glad to get suggestions, and always ready to try the suggestions."

The New England Company's piano that Howard sold was simply its second quality instrument, and he was a salaried employé. He did not buy the pianos, nor sell them at his own risk. Indeed, Howard himself testified (in the cancellation proceeding and before this suit brought), "I never worked on a commission in my life." But he was paid a stipulated salary by the New England Company, which salary was not based on the number of pianos sold in any year, although he did get (apparently as a gratuity) $1,000 more than his agreed salary the first year he worked for the New England concern, and thereafter his salary was increased from year to year.

In 1894, Howard transferred his allegiance to Fischer & Co., but until 1896 or 1897, whenever he got a chance to sell a piano with the Howard mark upon it, he did so and sent in the order to the New England Company. Scanlon says this ceased about 1897; it probably stopped in 1896. No other salesman except Howard sold pianos with the "Howard" mark upon them. No "royalty" was ever paid for the use of this name; but, as Howard himself testified, the sales were made "for the good of the New England Piano Company's business as a whole."

There is no doubt that, from the time any variant of "Howard" was inscribed upon pianos, the retail trade, the user, and the public generally spoke of them as "Howard" pianos; but there is no completely satisfactory proof that the New England Company ever put out any piano bearing the word "Howard" alone. There is evidence that it was done; but, after the most careful search, but one specimen of such a piano has been found in the whole United States, and I do not think that the exact date of this piano has been clearly shown. It is found that any use of the word "Howard" on the fall-board of a piano made by the New England Company was sporadic; but there were thousands sold under the title "R. S. Howard & Co.," "Howard, New York," "Howard & Co., Boston," and "R. S. Howard & Co., Boston." After 1896 the New England Company completely ceased using any variant of the word "Howard"; whatever right or title they had in or to that name was abandoned.

In that year Howard entered the employment of the Baldwin concern. The arrangement was oral, and with a Mr. Wulsin, who died before suit brought. Howard says that pianos bearing his name were to be manufactured for him at an agreed price, of which he had a.

memorandum, and he was to be credited with the difference between that price and the price he obtained for them; *which was the same arrangement that he had had with the New England Company.* He guaranteed all the pianos and purchased outright from the Baldwin Company a good many instruments, which he either sold to dealers or consigned to them.

This testimony is untrue, because he never had any such arrangement with the New England Company, and it is utterly inconsistent with his previous oath that he never worked on a commission in his life. The account books produced by the plaintiff persuade me that until 1899 Howard did work on a commission; he did sell pianos bearing the name "Howard" with the adjuncts set forth in the first registered trade-mark; but he also sold all the other makes produced by plaintiff [2] if he could; and any other salesman for the plaintiff sold "Howards" if he found a market for them.

It is true that if Mr. Howard found a customer whom he liked and would take a risk on he guaranteed the account; but the sale was always made by the plaintiff, and the business of selling was the plaintiff's; and it was not until 1896 that the word "Howard" alone was habitually and extensively used on the fall-board of any piano.

In 1899, by written agreement, Howard became a salaried salesman for plaintiff, and within the territory allotted to him continued to do just what he had done from 1896–1899. In 1902, he resigned from plaintiff's employ, established the defendant company, and began to put out pianos uniformly marked on the fall-board with the corporate name. I am of the opinion that there is no evidence that defendant corporation has ever put the word "Howard" alone on the fall-board of a piano; but there is no denial of the statement that, beginning in or about 1913, the name "Howard" unaccompanied by any initials or addendum was placed upon the back of the piano.

The result of the foregoing is that, with the exception of a few sporadic instances of which only one has (even by defendant's contention) been located, the only piano labeled on its front with the word "Howard" (simplicitor) ever put forth is plaintiff's instrument, of which the sales have grown from about $140,000 in 1896 to upwards of a million dollars in 1914. This business is the result of the energy of the plaintiff, undoubtedly assisted from 1896–1902 by Mr. Howard, for which assistance he was fully paid at rates presumably satisfactory to himself.

The foregoing findings of fact (if correct) leave the case resting upon legal principles so simple as to require but little discussion.

In and prior to 1896, if anybody had or could have a trade-mark in the word "Howard" or any variant thereof as applied to pianos, the New England Piano Company had it. Whatever that company had it abandoned.

If Howard's story of the relations established by him with the

[2] It is to be remembered that the word "plaintiff" as used herein covers not only the Baldwin Company, but all its predecessors in business, and assignors of business.

Baldwin concern in 1896 were true, a good deal might be said in favor of the proposition that he had a trade-mark.

[1] But not only is the statement untrue because inconsistent with other testimony of his own, and with the account books of the plaintiff (as above shown), but it largely consists in Howard's narration of what Mr. Wulsin said to him on his becoming a Baldwin salesman. This evidence is obviously obnoxious to section 829 of the New York Code of Civil Procedure; but, if considered, such consideration renders Mr. Wulsin's report to his corporation of the circumstances of Howard's employment competent evidence.

[2, 3] Having regard to the probabilities of the matter and to the contradictions of Howard's testimony, I have no doubt that, as Wulsin stated, it was "clearly understood that the use of this name (Howard) gives no rights to Mr. Howard other than his privilege to sell to dealers acceptable to us; his compensation being price received in excess of $95 for style 7."

If Howard had no business when he entered the Baldwin employ, and his agreement with plaintiff was as above found, he certainly created no business during his period of employment in the sense that must be assigned to that word in order to sustain trade-mark rights.

Down to 1902 Howard was not a manufacturer, a jobber or a retailer of pianos; he was a salesman, receiving (as he says) a salary only, or (as I believe) sometimes a salary and sometimes a commission, perhaps at times both; but always and all the time his relation to his employers was exactly that of a highly favored clerk who sells (for example) neckties over a counter, and being a well-dressed man himself is permitted to call one of his employer's styles of neckties by his own name.

That there can be no such thing as a transfer of a trade-mark in gross is too true to need citation to support it. If in 1902 Howard had no established business of his own, he had no trade-mark.

That Mr. Howard had an established and well-tested capacity to get business and make business is an entirely different thing; this he had, and this, and this alone, he contributed to the R. S. Howard Company. It seems to have turned out a valuable contribution. But because he had no business other than his own active mind and winning ways in 1902, he could not hand over to the defendant any rights even in his own name which were appurtenant to and dependent upon a business of manufacturing, buying, and selling belonging to him. As above pointed out, he was not even a jobber, and never had been, and therefore the case much relied upon by defendant of Nelson v. Winchell, 203 Mass. 75, 89 N. E. 180, 23 L. R. A. (N. S.) 1150 is inapplicable.

What Howard did have in 1902 was the undeniable right to use his own name in his own business, and this he has done, and this is all he hoped to do (in my judgment) until about 1904, when he began to talk with plaintiff's New York representative about getting sole control of the name "Howard." He followed up this thought in 1905 by beginning two actions in the Supreme Court of this state against plaintiff and some of its officers. The complaint in that case is instruc-

tive. It sets forth over Howard's verification that since 1889 Howard had manufactured or caused to be manufactured and sold a style of piano "created by him" which he caused to be marked with the name "Howard"; that in 1897, after Howard had been manufacturing or causing to be manufactured and sold pianos bearing this name of "Howard" for upwards of eight years, he entered into an agreement with D. H. Baldwin & Co., whereby that concern "agreed to manufacture said pianos bearing the name "Howard" for said Robert S. Howard"; and finally this complaint states that in consideration of this agreement he permitted Baldwin & Co. to use his name "Howard" upon pianos manufactured by them for sale in their stores.

It is further instructive to compare this verified complaint with defendant's verified application to cancel plaintiff's trade-marks herein. In that application it is said that in 1889 and prior thereto Howard was engaged in New York in the sale of pianos manufactured for him, and in that year he adopted "Howard" as his trade-mark for the pianos manufactured for him and sold by him, and that he continued to have pianos so manufactured and marked continuously until the time he transferred said trade-mark, together with his business of manufacturing and selling pianos to the defendant herein.

The pleadings in the New York Court, in the Patent Office, and in this court, when compared with the testimony, appear to me to furnish a very strong confirmation of the result in matters of fact above attempted to be set forth. This course of pleading and defendant's line of argument all rest, I think, upon the assumption that a trade-mark or trade-name is something that belongs to the first devisor thereof through every change of his business relations, and follows him like a patent or a copyright. On this point the recent decision in Hanover Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713, is perhaps sufficient authority. My own views I have set forth at some length in Carroll v. McIlvaine (C. C.) 171 Fed. 125, affirmed 183 Fed. 22, 105 C. C. A. 314, and lately in President Suspender Co. v. McWilliams, 233 Fed. 433 (opinion dated January 10, 1916).

The net result is that plaintiff, and plaintiff alone, is entitled to use the word "Howard" (simplicitor) on the fall-board of pianos, in the name of the company that manufactures those pianos or handles them or sells them. and in advertising matter relating to pianos. Similarly the defendant and defendant alone is entitled to use "R. S. Howard" or "Robert S. Howard" in like manner. In other words, their relations to the word "Howard" must remain as heretofore, and as acquiesced in by both parties until in 1914 Mr. Howard began the cancellation proceedings in the Patent Office.

I am inclined to think, if this court has the power, it is inadvisable to seek to prevent the continuance of the cancellation proceedings in the office.

It is plain to me that the object of these proceedings is primarily to get rid of something which constitutes an obstacle to the extension into certain foreign countries (e. g., Cuba and Uruguay) of the business of the R. S. Howard Company.

I doubt whether under our law the name "Howard," being a not

infrequent surname and place name, can be appropriated as a strict trade-mark. I have no doubt that the original registration in 1898 was made with the full knowledge and consent of Mr. Robert S. Howard. He admits the knowledge; the consent is implied from the course of business. But if he could not make a strict trade-mark out of his own name, I am unable to see how anybody else could do it even with his consent.

The defendant's counterclaim must be dismissed, with costs, and the plaintiff given a decree, with costs; but I incline to ground that decree solely on principles of unfair competition, and leave the trade-mark situation to take care of itself; but upon this point I am willing to hear further argument if the matter is pressed, as it was not much alluded to in argument.

### On Settlement of Final Decree.

[4] After reflection, I am convinced that the proper order should preserve that status of the parties to this suit which existed until the defendant began to stamp "Howard" merely on the back of its pianos and to encourage advertising (if not to advertise itself) under the name "Howard" alone.

The defendant has never used "Robert S. Howard" or "R. S. Howard" without the suffix "Company" or "Co." There is no reason why it should do it; there is no evidence that it has any right to do it—although Mr. Howard could doubtless create that right (so far as he is concerned) at any moment.

The plaintiff has the superior right, and that superior right can best be maintained by requiring the suffix "Company" or "Co." to be used by the defendant.

I have therefore signed the decree as propounded by plaintiff.